UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL JAMES PEXA; MARY MCCLURE PEXA,<br><br>    Appellants,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Appellee. | No. 2:16-cv-00994-TLN<br><br>**ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT** |

    The matter is before the Court pursuant to Michael James Pexa and Mary McClure Pexa's ("Appellants") appeal of a judgment of the United States Bankruptcy Court for the Eastern District of California overruling Appellant's objection to the claim of the Internal Revenue Service ("IRS") pursuant to 11 U.S.C. § 502(a). (ECF No. 4.) The United States of America ("Appellee") filed an opposition (ECF No. 6), and Appellant filed a reply, (ECF No. 8). For the reasons discussed below, the judgment of the bankruptcy court is AFFIRMED.

///
///
///
///
///

1

**I.     FACTUAL BACKGROUND**

In June 1984, Appellant Michael Pexa ("Pexa") began working as an insurance agent for Farmers Insurance Group ("Farmers"), where he sold auto, home, life, and commercial insurance policies to customers he developed through his marketing efforts. (ECF Nos. 4 at 3; 7-11 at 4.) Pexa was extremely successful as an agent, becoming a member of the "Championship Club," which represents the top three or four percent of the entire Farmers' national agency force for the year. (ECF Nos. 4 at 3; 7-11 at 4.)

On May 1, 1998, Pexa was promoted to the position of district manager. (ECF No. 7-11 at 18–19.) A district manager is not an insurance agent and serves a different role than an insurance agent. (ECF No. 7-11 at 19.) As a district manager, Pexa recruited, trained, and supervised insurance agents, and was forbidden from selling insurance. (ECF No. 7-11 at 19.) Pexa received compensation from Farmers in the form of commissions on the policies sold by the insurance agents that he recruited, trained, and supervised. (ECF No. 7-11 at 19.)

When Pexa became a district manager, he testified that he needed to get rid of his "agency." (ECF No. 7-11 at 5.) Pexa sold his "agency" to his sister for about $323,000 (payable over 20 years), the amount of the contract value set by Farmers. (ECF No. 7-11 at 5.) Pexa is still receiving payments from his sister for this transaction. (ECF No. 7-11 at 5.) Pexa contends that he has been treating the interest on his sister's payments as ordinary income and the principal as capital gains. (ECF No. 7-11 at 5.) According to Pexa, he has been audited on several occasions and in none of those audits were major issues raised by the IRS. (ECF No. 7-11 at 5.)

In early 2009, Pexa was unhappy with his relationship with Farmers and sent a letter to Farmers discussing his unhappiness with changes in Farmers' practices. (ECF No. 7-11 at 5–6, 19.) This letter was interpreted by Farmers as an invitation by Pexa to terminate his relationship as a district manager. (ECF No. 7-11 at 19.) On January 26, 2009, Farmers issued Pexa a 30 day notice of termination pursuant to paragraph (d) of Pexa's District Manager Appointment Agreement (the "Agreement"), which provided that the Agreement "may be cancelled without cause by either the District Manager or [Farmers] on 30 day written notice." (ECF Nos. 7-5 at 2; 7-11 at 6.) Pursuant to the Agreement, upon termination, Farmer's was required to pay Pexa the

"contract value," an amount determined based on the number of years Pexa worked as a district manager and the commissions he received during the six months immediately preceding his termination. (ECF Nos. 7-5 at 2; 7-11 at 6–7.) In the event that Farmers elected to pay the "contract value," Pexa agreed to "transfer and assign all of his interest under the agency to the nominee acceptable to [Farmers] or to [Farmers]." (ECF No. 7-5 at 3.)

Over the course of 2009 and 2010, Farmers issued Pexa "contract value" payments[1] totaling $958,383.20, the amount equal to five times (due to the number of years of service as a district manager) the last six months of commissions Pexa received as a district manager. (ECF Nos. 6 at 4; 7-11 at 7, 19.) These "contract value" payments were first applied to Pexa's outstanding loan balances and liabilities with Farmers. (ECF No. 7-11 at 20.) The remainder of the "contract value" payments was distributed to Pexa through four installments over the course of 2009 and 2010. (ECF No. 7-11 at 20.) Upon Pexa's termination, Farmers also collected records and materials that Pexa had in his possession. (ECF No. 7-11 at 21.) As per the Agreement, "all records, levy lists, cards, books, manuals, papers, forms, or other material of whatsoever kind, and all copies thereof, whether or not furnished by any of the Companies, having to do with any manner with the business or [Farmers]" were required to be returned to Farmers. (ECF No. 7-5 at 1.) Moreover, "all lists and records of any kind pertaining to the policyholders or expiration, and also the information contained therein, [were] the secret and confidential property of [Farmers]." (ECF Nos. 7-5 at 2; 7-11 at 21.)

Farmers reported the "contract value" payments to the IRS via Form 1099-MISC, miscellaneous income as non-employee compensation. (ECF No. 7-11 at 20.) Pexa received letters dated March 3, 2009, August 18, 2009, March 3, 2010, and September 16, 2010 stating the following: "Please note that Farmers must report your Contract Value to the IRS, via form 1099-MISC, as non-employee compensation paid to you. You may benefit by consulting an independent tax professional for advice on meeting the associated tax obligation." (ECF No. 7-11 at 20.) Pexa never contacted Farmers requesting that the amount be reported differently, and

---

[1] In the Farmers vernacular, these "contract value" payments are interchangeably referred to as termination payments. (ECF No. 7-11 at 20.) For clarity, the Court will refer to them only as "contract value" payments.

Pexa reported the "contract value" payments he received as either gross receipts (2009) or other income (2010) on his Schedule C for each tax year. (ECF No. 7-11 at 20.)

For the 2009 and 2010 tax years, Pexa (who lives in Roseville and worked in the greater Sacramento area) hired Mr. Gary Allen of Yreka, California (approximately 250 miles away) to assist with preparing and filing his 2009 and 2010 tax returns. (ECF No. 7-11 at 21.) Pexa did not provide detailed documentation to Mr. Allen for the preparation of the 2009 and 2010 returns. (ECF No. 7-11 at 43.) Mr. Allen simply accepted summary worksheets that included the items of income and deductions that Pexa believed he should claim on his returns. (ECF No. 7-11 at 43.) Mr. Allen took Pexa's word for what his income and expenses were and prepared the returns accordingly. (ECF No. 7-11 at 44.) Mr. Allen was not provided with the 1099 forms, nor was he provided with the Agreement. (ECF No. 7-11 at 44.)

Mr. Allen believed that the "contract value" payments Pexa received from Farmers were for work that Pexa performed as an insurance agent, and he was unfamiliar with the term district manager and the responsibilities associated with the position. (ECF No. 7-11 at 21.) Mr. Allen testified that he found the case *Johnson v. Commissioner*, which discusses "contract value" relating to insurance agents, and he used that case as a basis for classifying the "contract value" payments as capital gains income. (ECF Nos. 7-8 at 13; 7-11 at 21–22.)

On Pexa's 2009 and 2010 tax returns, the "contract value" payments were included as gross receipts on his Schedule C. (ECF No. 7-11 at 22.) On both returns, the same amount of the "contract value" payments was then deducted by being listed under "other expenses" of the relevant Schedule C. (ECF No. 7-11 at 22.) For the 2009 tax year, a portion of the "contract value" payments was reported as capital gains. (ECF No. 7-11 at 22.) For the 2010 tax year, none of the "contract value" payments were reported as capital gains. (ECF No. 7-11 at 22.)

## II. PROCEDURAL HISTORY

On November 21, 2014, Appellants filed a Chapter 7 bankruptcy petition. (ECF No. 6 at 11.) On February 11, 2015, the Commissioner of the IRS issued a notice of deficiency, which set forth the results of the audit examination of Appellants' 2009 and 2010 tax returns and asserted a proposed assessment of additional tax liabilities for these two years. (ECF No. 6 at 11.) On May

7, 2015, the IRS filed an amended proof of claim (Claim 4-2), asserting the exact same amounts of additional taxes and penalties owed that were asserted in the notice of deficiency.[2] (ECF No. 6 at 11). On July 27, 2015, Appellants objected to the IRS's proof of claim, creating the underlying contested issue. (ECF No. 7-1 at 1–2.) Appellee opposed the objection. (ECF No. 7-1 at 46.) By the time of trial, the issues in dispute were narrowed to the following: (1) whether the "contract value" payments should be classified as ordinary income or long term capital gains and 2) whether Appellants' could be excused from accuracy-related penalties under the defense of reasonable cause and good faith. (ECF No. 6 at 12.)

On March 14, 2016, the bankruptcy court conducted a one-day bench trial, and issued findings of fact and conclusions of law orally on the record on March 30, 2016. (ECF Nos. 7-1 at 99, 121, 124; 7-10; 7-11.) On April 27, 2016, the bankruptcy court issued a written judgment, incorporating its findings of fact and conclusions of law issued orally on March 30, 2016. (ECF No. 7-1 at 125.) The bankruptcy court decided against Appellants on both issues, holding Appellants' income tax liabilities should have been characterized as ordinary income rather than long term capital gains, and finding Appellants' did not fall under the reasonable cause and good faith penalty exception. (ECF Nos. 7-1 at 125; 7-11 at 31–45.) On May 9, 2016, Appellants filed a Notice of Appeal. (ECF No. 7-1 at 127.)

### III. STANDARD OF REVIEW

In reviewing decisions of the bankruptcy court, legal conclusions are reviewed de novo and factual determinations are reviewed for clear error. *In re Comer*, 723 F.2d 737, 739 (9th Cir. 1984). A finding of fact is clearly erroneous if the reviewing court is left with a "definite and firm conviction that a mistake has been committed." *In re Contractors Equip. Supply Co.*, 861 F.2d 241, 243 (9th Cir. 1988). "The 'characterization of a transaction for tax purposes is a question of law subject to de novo review, but the particular facts from which that characterization is made are reviewed for clear error.'" *Brinkley v. C.I.R.*, 808 F.3d 657, 664 (5th

---

[2] Following Appellant's objection, the IRS filed two amended proof of claims, issuing the most recent proof of claim on May 18, 2016 (Claim 4-4). These amendments removed claims for tax years no longer being audited, correctly classified certain accuracy-related penalties as general unsecured claims, and included the correct interest accruals on the unsecured priority claims. (ECF No. 6 at 11.)

Cir. 2015); *see Trantina v. United States*, 512 F.3d 567, 570 n.2 (9th Cir. 2008) (holding that whether "the district court correctly ruled that the termination payments should be taxed as ordinary income and not as a long term capital gain" is a legal question reviewed de novo). Whether a taxpayer has satisfied the reasonable cause and good faith defense to an accuracy-related penalty under 26 U.S.C. § 6664(c) is a finding of fact reviewed for clear error. *Brinkley*, 808 F.3d at 668; *Hansen v. Commissioner*, 471 F.3d 1021, 1029 (9th Cir. 2006).

**IV. ANALYSIS**

Appellants argue the bankruptcy court erred for two reasons. First, Appellants argue the bankruptcy court incorrectly treated the "contract value" payments as ordinary income rather than long term capital gains. Second, Appellants argue the bankruptcy court erred in finding Appellants subject to certain accuracy-related penalties because Appellants had reasonable cause for the positon they took.

A. The Characterization of the "Contract Value" Payments

Appellants argue the "contract value" payments Pexa received qualify as long term capital gains, and thus they do not face additional tax liability. Appellee, conversely, contends the "contract value" payments merely constitute ordinary income, and therefore Appellants have understated their income tax liability. "The 'characterization of a transaction for tax purposes is a question of law subject to de novo review, but the particular facts from which that characterization is made are reviewed for clear error.'" *Brinkley*, 808 F.3d at 668. The only question at issue here is the legal question of whether the bankruptcy court correctly ruled that the "contract value" payments should be taxed as ordinary income and not as long term capital gains. *See Trantina*, 512 F.3d at 570 n.2. Therefore, the Court reviews this issue de novo.

The Commissioner's determination of a tax deficiency is presumed correct, and the taxpayer bears the burden of proving the determination to be erroneous. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). To prove that Pexa's "contract value" payments should be classified as long term capitals gains, Appellants must demonstrate that the payments: (1) arose from the sale or exchange, (2) of a capital asset held longer than one year, (3) and were given in consideration of this sale or exchange. *Trantina*, 512 F.3d at 571. The main issue in contention is whether

Appellants sold or exchanged a capital asset. However, a precondition to selling or exchanging a capital asset is the ownership of a capital asset. *Id*. at 573; *Baker v. Commissioner*, 338 F.3d 789, 793 (7th Cir. 2003) ("Fundamentally, in order to have the ability to sell something, one must own it."). Therefore, before the Court determines whether Appellants sold or exchanged a capital asset, it must determine whether Appellants owned a capital asset.

Appellants assert that the "district manger's insurance agency was the [capital] asset transferred to Farmers pursuant to the contract." (ECF No. 4 at 13.) Appellants then define the "district manager's insurance agency" as Pexa's business that was "built over eleven years" and was "well-developed, smooth-operating and generating significant cash flows." (ECF No. 4 at 15.) Simply put, Appellants are asserting the capital asset transferred was goodwill. (ECF No. 4 at 15 ("[T]he development of [Pexa's] business generated goodwill that effectively was transferred to Farmers.").)

The Seventh Circuit addressed this exact issue in *Baker*. 338 F.3d at 793. In *Baker*, the insurance agent sought to have his termination payments treated as long-term capital gains and argued the payments were in consideration of goodwill. *Id*. However, the court held that because the agent's contract contained a blanket reservation of property rights to the insurance company, the agent did not "own any assets related to the business," and could not transfer goodwill "apart from the business with which it was connected." *Id*. at 793–94. The Ninth Circuit adopted *Baker's* reasoning in *Trantina*, holding that because the express terms of the agent's agreement contained a blanket reservation of all property rights to the insurance company, the agent "simply had no property that could be sold or exchanged." 512 F.3d at 573.

As noted by the bankruptcy court, the Agreement here contains substantially the same reservation of property rights as the agreements in *Baker* and *Trantina*. (*See* ECF No. 7-11 at 32.) Therefore, Pexa did not own any assets related to his "agency." Rather, all assets related to the "agency" belonged to Farmers. (*See* ECF Nos. 7-5 at 1; 7-5 at 2; 7-11 at 21.) Thus, because goodwill cannot be transferred apart from the business with which it is connected, Pexa "could sell no assets, including goodwill." *See Baker*, 338 F.3d at 794.

The only "interest under the agency" that Pexa retained was a contractual right to perform

services for Farmers and receive compensation for those services as long as the Agreement remained in effect. However, a contractual right to perform services is not a capital asset. *Trantina*, 512 F.3d at 571–72 ("[T]he courts have quite uniformly held that contracts for the performance of personal services are not capital assets and that the proceeds from their transfer or termination will not be accorded capital gains treatment but will be considered to be ordinary income."). Therefore, because Pexa owned no capital asset, he could not sell or exchange a capital asset. Accordingly, the "contract value" payments that Pexa received are ordinary income, not long term capital gains.

### B. The Accuracy-Related Penalty

Whether a taxpayer has satisfied the reasonable cause and good faith defense to an accuracy-related penalty under 26 U.S.C. § 6664 is a finding of fact reviewed for clear error. *Brinkley*, 808 F.3d at 668.

Under 26 U.S.C. § 6662, a 20 percent penalty is imposed for any underpayment of tax attributable to a "substantial understatement of income tax." 26 U.S.C. §§ 6662(a), (b)(2). An understatement is substantial if it "exceeds the greater of . . . 10 percent of the tax required to be shown on the return for the taxable year, or . . . $5,000." *Id*. § 6662(d)(1)(A). However, taxpayers may be excused from accuracy-related penalties imposed by 26 U.S.C. § 6662 to the extent "it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1). "The taxpayer bears the burden of proof on this defense, and the determination of whether the taxpayer has successfully discharged this burden 'is made on a case-by-case basis, taking into account all pertinent facts and circumstances.'" *Brinkley*, 808 F.3d at 668–69 (citation omitted) (quoting 26 C.F.R. § 1.6664-4(b)(1)). "The most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances." *Id*. at 669.

The bankruptcy court found Appellants failed to prove there was reasonable cause for their understatement and failed to prove they acted in good faith. The court reasoned that Pexa, a seasoned businessman, had not provided his tax preparer, Mr. Allen, with the Agreement or the 1099s, and given these material omissions, it was not persuaded by a preponderance of the

8

evidence that there was reasonable cause, or that Pexa was acting in good faith, with respect to the understatements. (ECF No. 7-11 at 44–45.) Appellants argue that the bankruptcy court erred for two reasons, which will each be discussed in turn.

First, Appellants argue Pexa reasonably and in good faith relied on Mr. Allen in making the determination that his "contract value" payments constituted long term capital gains. This conclusion is unsupported by the evidence. (ECF No. 4 at 19.) There is no dispute that Pexa did not provide Mr. Allen with the material information necessary to make an appropriate determination of whether the "contract value" payments were long term capital gain. Namely, Pexa did not provide Mr. Allen with the Agreement — the single most important document in this determination and the document that dictated the payments Pexa would receive. Therefore, the evidence supports a finding that Pexa could not have reasonably relied on Mr. Allen. *See* 26 C.F.R. § 1.6664-4(c)(i) ("The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances.")

Second, Appellants argue the IRS did not object to Pexa's classification of his sister's payments as long term capital gains, and thereby they reasonably and in good faith believed the IRS had approved of long term capital gain treatment for "contract value" payments. (ECF No. 4 at 19.) However, the fact that Pexa classified payments arising out of one transaction as long term capital gains does not necessarily have bearing on whether or not Pexa reasonably and in good faith classified the payments at issue, arising out of a different transaction, as long term capital gains. Moreover, there is no evidence that Pexa classified these prior payments reasonably and in good faith. Therefore, the facts support a finding that Pexa did not make a reasonable and good faith effort to assess his tax liability and could not reasonably and in good faith rely on Mr. Allen or former tax returns in determining whether the "contract value" payments constituted long term capital gains. Accordingly, the court finds no clear error in bankruptcy court's finding that Appellants did not carry their burden to prove they acted with reasonable cause and in good faith.

### V. CONCLUSION

For the foregoing reasons, the Court hereby AFFIRMS the judgment of the bankruptcy

9

court.

IT IS SO ORDERED.

Dated: May 7, 2018

Troy L. Nunley
United States District Judge